1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Eric John King,                       )
                                           )        CV-98-1277-PHX-RCB
10          Petitioner,                     )
                                           )
11    v.                                    )
                                           )        **MEMORANDUM OF DECISION**
12    Dora Schriro, et al.,[1]              )        **AND ORDER**
                                           )
13          Respondents.                    )
                                           )
14   _____      )

15          Eric John King (Petitioner) filed a petition for writ of habeas corpus alleging that he

16   is imprisoned and sentenced to death in violation of the United States Constitution.  The

17   second amended petition raises thirteen claims.  (Dkt. 26).[2]  In an Order dated September

18   26, 2000, the Court found that Claims 1, 2, 4, 6, 7, 10, 12, and 13 (in part) were procedurally

19   barred and that Claim 9 failed on the merits.  (Dkt. 46.)  The Court found that Claims 3, 5,

20   8, 11, and 13 (in part) were properly exhausted and subject to review on the merits.  (Id.)

21   This Order reviews those claims.  For the reasons set forth herein, the Court concludes that

22   Petitioner is not entitled to habeas relief.

23

24   _____

25          [1]      Dora Schriro, Director of the Arizona Department of Corrections, is substituted
     pursuant to Fed. R. Civ. P. 25(d)(1).

26
             [2]      "Dkt." refers to the documents in this Court's file. "M.E." refers to the minute
27   entries of the state court.  "ROA" refers to the record on direct appeal to the Arizona
     Supreme Court (Case No. CR-91-0084).  "ROA-PCR" refers to the record from the post-
28   conviction proceedings (Case No. CR-97-0527-PC). "RT" refers to the reporter's transcript.

# BACKGROUND

On January 4, 1990, Petitioner was indicted on two counts of first-degree murder and one count of armed robbery. (ROA 2.) The Arizona Supreme Court described the relevant factual background as follows:

Shortly after midnight on December 27, 1989, a black male, brandishing a pistol, robbed the Short Stop convenience market at 48th Street and Broadway in Phoenix. During the course of the robbery, both the store clerk and security guard were shot and killed. The robbery was captured on two time-lapse video cameras. The videotape was admitted into evidence and showed the robber pointing the gun at the clerk and that clerk moving backward and then falling to the floor as the robber left the store. Photographs developed from the videotape depict a black male wearing a dark sweater with a band of light colored, diamond-shaped markings across the chest and arms. No one else was present in the store at the time of the robbery.

At approximately midnight on December 27, Frank Madden drove to the Country Kitchen restaurant parking lot, which is behind the Short Stop on the north side, where he was to meet his date. As he drove past the Short Stop toward the restaurant, he saw two black men walking in the parking lot. The men were a little over 6 feet tall and one of them wore a blue or black and white sweater with "some kind of pattern like pyramids"; the other man wore a "green sweatshirt."

Madden and his girlfriend discovered that the restaurant was closed. As they were talking, they heard gunshots and immediately drove over to the Short Stop. When Madden got out of his car and walked toward the front of the store, he saw the security guard, with an empty gun holster, lying on the ground. At the same time, the black man with the dark sweater, who Madden had seen earlier at the Country Kitchen parking lot, was also walking toward the store.

Madden heard the guard moaning and saw blood on the right side of his stomach. He phoned 911. While Madden was on the phone, the man with the dark sweater went over to the security guard, pulled out a white cloth, and wiped the guard's holster and belt. After Madden saw him, the man in the dark sweater left the scene. Madden could not positively identify defendant as the man he saw that night, but he testified that the man he saw had "high cheekbones" like defendant's, that defendant looked very familiar, and the only difference was that the man he saw had facial hair and was not as nicely dressed as defendant.

Around midnight, Kevin Harris and his friend David Dils were driving through the intersection of 48th Street and Broadway when they too heard gunshots. Harris was looking in the direction of the Short Stop and saw two black men running away from the store; one of the men held a gun in his hand. Harris and Dils drove into a nearby parking lot, got out of the car, and approached the store. Harris saw the security guard lying on the ground and a man using the phone. Dils checked the guard's pulse and found none. They then entered the store and saw the clerk behind the counter; he had been shot in the right shoulder and stomach and was holding a telephone yelling into the

receiver. Dils and Harris assisted the clerk until the fire department arrived.

Shortly after the shootings, Nolan Thomas, his son Derek, and Greg Hecky pulled into the Short Stop. Just as Nolan parked his car, Derek directed his dad's attention to the security guard lying on the ground. Nolan looked over and saw a black man with a mustache and goatee, wearing a black sweater with a white "logo," bending over the security guard. Like Madden, he saw the man wipe off the guard's empty holster with a white rag and then run off.

About that time, Phoenix Police Sergeant Richard Switzer received a radio call to go to the Short Stop. The call included a description of the suspects. While driving east on Broadway, he saw two black males walking west on Broadway across 44th Place. Sgt. Switzer made a U-turn and drove toward the men to determine whether they fit the suspects' descriptions. Sgt. Switzer shined a spotlight on the two men, got out of his car, and walked toward them. Despite Sgt. Switzer's order to "halt," one of the men, wearing a blue sweater with white markings on the upper sleeve, fled the scene running south. The man who stopped identified himself as Michael Jones. After being asked about the man who ran away, Jones told Sgt. Switzer that he had just met the man and did not know him. At trial, Sgt. Switzer testified that he remembered the man he saw with Jones that night as being slightly taller than Jones, who was 6 feet 1 inches tall.

Later that night, Nekita Renee Hill and her friend Joann Smith walked to Smith's house. Ms. Smith lived in the area of 48th Street and Broadway, and her house was within walking distance of the Short Stop. During their walk, they noticed helicopters flying overhead.

As they approached Smith's house, Hill saw defendant walking toward a dumpster. She saw him throw a light-colored, thin plastic bag in the dumpster. The bag contained a gun and a dark sweater with a white diamond pattern that Hill had seen defendant wearing earlier that night.

Hill knew defendant, who was a childhood friend of her boyfriend Jones; defendant had frequently visited Jones at Smith's house while Hill was there. Sometime later, Hill saw a picture on television that she recognized as defendant. When she saw defendant's picture, she called the police.

State v. King, 180 Ariz. 268, 270-71, 883 P.2d 1024, 1026-27 (1994), cert. denied, 516 U.S. 880 (1995). (Id.) Jones and Petitioner were both arrested. Jones was later released and no charges were filed against him. (Id.)

A jury convicted Petitioner of all charges; the court sentenced him to death for the two first-degree murder counts. (ROA 165.) Petitioner appealed to the Arizona Supreme Court, which affirmed the convictions and sentences. King, 180 Ariz. at 270, 883 P.2d at 1026.

Petitioner filed a petition for post-conviction relief (PCR) in the trial court pursuant to Rule 32 of the Arizona Rules of Criminal Procedure; he also requested an evidentiary

hearing. (ROA-PCR 287.)  The trial court denied the petition without a hearing.  (ROA-PCR 299; M.E. 4/10/97.)  Petitioner filed a motion for rehearing (ROA-PCR 300), which the court also denied (ROA-PCR 303; M.E. 7/28/97).  Petitioner then filed a petition for review in the Arizona Supreme Court (ROA-PCR 308), which was summarily denied on June 25, 1998.

Petitioner filed a petition for writ of habeas corpus on July 14, 1998.  (Dkt. 1).  He filed an amended petition (dkt. 22) on November 20, 1998, and a second amended petition on December 11, 1998 (dkt. 26).

In response to this Court's procedural default order (dkt. 46), Petitioner filed a memorandum in support of his second amended petition on December 21, 2000, addressing the merits of the remaining, properly-exhausted, claims (dkt. 51).  Respondents filed a response (dkt. 53), and Petitioner filed a supplemental memorandum and reply (dkt. 57).[3]

## LEGAL STANDARD FOR FEDERAL HABEAS RELIEF

Petitioner's claims are governed by the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA established a more rigorous standard for habeas relief.  See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003).  As the Supreme Court has explained, the AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (quoting Lindh, 521 U.S. at 333 n.7).

Section 2254 provides:

---

[3]     Petitioner's reply raises a new claim by alleging that his death sentence is invalid because it was imposed by a judge rather than a jury. (Dkt. 57.) A reply brief is not an appropriate vehicle for raising a new claim. In any event, the claim is without merit. In Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating factor necessary for imposition of the death penalty. In Schriro v. Summerlin, 542 U.S. 348 (2004), however, the Court held that Ring does not apply retroactively to cases, such as Petitioner's, that were already final on direct review at the time Ring was decided.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Williams v. Taylor, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. Id. at 365; see Musladin v. Lamarque, 427 F.3d 653, 655 (9th Cir. 2005) ("AEDPA limits the source of clearly-established federal law to Supreme Court cases"); Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. Williams, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be of "persuasive value" in determining what law is clearly established and whether a state court applied that law unreasonably. Musladin, 427 F.3d at 655 (collecting cases); see Clark, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially

indistinguishable from a decision of the Supreme Court but reaches a different result. <u>Williams</u>, 529 U.S. at 405-06; <u>see</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  <u>Id.</u> at 406; <u>see</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 76 (2003) (citing <u>Williams</u>, 529 U.S. at 407); <u>see</u> <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  <u>See</u> <u>Williams</u>, 529 U.S. at 409; <u>Visciotti</u>, 537 U.S. at 25.

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. <u>See</u> <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002); <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000) (<u>Delgado II</u>). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law.  <u>Himes</u>, 336 F.3d at 853; <u>Pirtle</u>, 313 F.3d at 1167.  Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision.  <u>Pirtle</u>, 313 F.3d at 1167 (citing <u>Delgado II</u>, 223 F.3d at 981-82); <u>see also</u> <u>Himes</u>, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference."  <u>Pirtle</u>, 313 F.3d at 1167; <u>see also</u> <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1025-26 (9th Cir. 2005); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

**DISCUSSION**

The Court now applies these principles to Petitioner's claims to determine whether, pursuant to § 2254(d)(1), the state court decisions denying Petitioner's claims were contrary to, or involved an unreasonable application of, clearly established federal law.

**Claim 3:     Prosecutorial misconduct during opening statement.**

Petitioner alleges that his rights to a fair trial and due process were violated by comments made during the prosecutor's opening statement.  (Dkt. 51 at 3.)  Specifically, Petitioner contends that the prosecutor engaged in prejudicial misconduct when he vouched for the credibility of one of the State's witnesses, Mr. Jones, and declared to the jury that another witness, Ms. Hill, feared for her safety.  (Id. at 3-9.)  For the reasons set forth below, the Court concludes that this claim is without merit.

Clearly established federal law provides that the appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)).  Therefore, in order to succeed on this claim, Petitioner must prove not only that the prosecutor's remarks were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Id.; see Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)).

In determining if Petitioner's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to the judge the evidence fairly."  United States v. Young, 470 U.S. 1, 12 (1985).  To make such an assessment, it is necessary to place the prosecutor's remarks in context.  See Boyde v. California, 494 U.S. 370, 385 (1990); United States v. Robinson, 485 U.S. 25, 33-34 (1988); Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998).  In Darden, for example, the Court

assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and the weight of the evidence against the accused. 477 U.S. at 181-82.

### A. Comment regarding Jones's testimony.

*Background:*

With respect to Jones's prospective testimony, the prosecutor made the following comments during his opening statement:

> You will hear from a man by the name of Michael Page Jones. Mr. Jones was with Eric King that night. In fact, at one time Mr. Jones was charged as an accomplice. The case was later dismissed. Michael Jones was with Mr. King. He told the police officers later in December exactly what happened. I can't guarantee you what Mr. Michael Page Jones is going to say when he gets on the stand, ladies and gentlemen, but he was there that night and he has information, and I suggest to you that if he testifies truthfully as he should, he will implicate the defendant, Eric King, without a doubt.

(RT 8/28/90, Volume 3A at 67.)

After the prosecutor completed his opening statement, defense counsel moved for a mistrial, claiming that the prosecutor had improperly vouched for Jones's credibility. (Id. at 72-73.) The trial judge denied the motion, stating that he did not "believe there was a clear vouching of the witness." (Id. at 73.) The judge further noted that he had admonished the jury before opening statements that none of counsels' comments were evidence and that he would be giving a similar admonition before closing arguments. (Id.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim, finding that the prosecutor's statements, when placed in context, did not constitute improper vouching for the witness. King, 180 Ariz. at 277, 883 P.2d at 1033. The court explained:

> With these statements, the prosecutor was voicing his expectation that Jones's testimony would be consistent with the earlier statements that he made to the police, and that he would implicate King. At the same time, however, the state was preparing the jury for the possibility that Jones might testify otherwise. We fail to see, nor does defendant explain, how, by suggesting that one of its own witnesses might lie on the stand, the state was vouching for the credibility of its witness. Because we find that the state did not vouch for the credibility of its witness, we find no error.

1   <u>Id.</u> (citations omitted).

2       *Analysis:*

3       One form of prosecutorial misconduct occurs when a prosecutor vouches for the

4   credibility of a witness. <u>See</u> <u>Young</u>, 470 U.S. at 18-19; <u>Lawn v. United States</u>, 355 U.S. 339,

5   359-60 n. 15 (1958); <u>United States v. Berger</u>, 295 U.S. 78, 86-88 (1935). "Vouching consists

6   of placing the prestige of the government behind a witness through personal assurances of

7   the witness's veracity, or suggesting that information not presented to the jury supports the

8   witness's testimony."  <u>United States v. Necochea</u>, 986 F.2d 1273, 1276 (9th Cir. 1993)

9   (citing <u>United States v. Roberts</u>, 618 F.2d 530, 533 (9th Cir. 1980)).   Such vouching

10  constitutes misconduct because it may lead the jury to convict on the basis of evidence not

11  presented; it also carries the imprimatur of the government, which may induce the jury to

12  adopt the government's judgment rather than its own.  <u>See</u> <u>Young</u>, 470 U.S. at 18.

13      This Court agrees with the Arizona Supreme Court's characterization of the

14  prosecutor's opening statement as preparing the jury for the possible courses Jones's

15  testimony might take, rather than vouching for Jones's credibility as a witness.  By

16  "suggesting" that if Jones testified truthfully he would implicate Petitioner, the prosecutor

17  neither placed the prestige of the government behind the testimony nor implied that the

18  government had additional information which would support the credibility of the testimony

19  but would not be presented to the jury.  Moreover, to the extent that the prosecutor's

20  comments implied the existence of additional information that would corroborate Jones's

21  testimony, that information was not withheld from the jury but was presented through the

22  testimony of Detective Saldate.

23      Even if the Court were to accept Petitioner's characterization of the comments as a

24  form of vouching, Petitioner's claim would fail because he has not shown that he was

25  prejudiced by the prosecutor's conduct. The Ninth Circuit has observed that courts consider

26  a number of factors in determining whether prosecutorial vouching requires reversal of a

27  conviction. <u>See</u> <u>Necoechea</u>, 986 F.2d at 1278.  These factors include:

28

[T]he form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

Id.  A review of these factors indicates that the prosecutor's comments regarding Jones's testimony did not render Petitioner's trial unfair.

While Jones's testimony was crucial to the State's case, and the prosecutor's comments occurred before Jones's credibility had been challenged, id.; United States v. Shaw, 829 F.2d 714, 717 (9th Cir. 1987), other factors support a finding that the comments were not prejudicial within the context of the entire trial.  For example, the comments represented a single, "isolated incident."  United States v. Combs, 379 F.3d 564, 574 (9th Cir. 2004).  The fact that they were not part of an ongoing pattern of misconduct weighs against a finding of unfairness.  In addition, the remarks were prefaced with the phrase "I suggest," which, like the phrase "I submit," "has been preferred to the use of 'I think,' in part because the latter is more likely to lead the jury to give undue credit to the statement that follows."  United States v. Weatherspoon, 410 F.3d 1142, 1147 n.3 (9th Cir. 2005); see United States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992).

Furthermore, the prosecutor's comments did not attain the level of personal assurances of a witness's veracity which courts have found objectionable in other cases.  For example, the prosecutor did not imply that the truthfulness of the witness's testimony would be monitored.  See Shaw, 829 F.2d at 717 (improper vouching occurred where the prosecutor implied that he would be able to determine whether the witness was testifying truthfully); Roberts, 618 F.2d at 533 (improper for prosecutor to tell the jury that police were monitoring the trial to determine that the witness testified truthfully).  Likewise, the prosecutor did not "deliberately introduce[] into the case his personal opinion of the witnesses' credibility," as the prosecutor did in Kerr, through comments such as, "I think he [the witness] was very candid."  Kerr, 981 F.2d at 1053.

1    The impact of the prosecutor's comments regarding Jones was also lessened by the

2    court's instructions to the jury.  Prior to the opening statements, the trial court offered

3    instructions on witness credibility:

> It is your job as jurors to decide the accuracy of each witness' testimony. Take into account such things as a witness' ability and opportunity to observe, the witness' memory and manner while testifying, any motive or prejudice the witness might have, and any inconsistent statements of the witness. Consider each witness' testimony in the light of all the evidence in this case.

7    (R.T. 8/28/90, Volume 3A at 60.)  The court also advised the jury about the limited purpose

8    of counsels' opening statements: "What the lawyers say in their opening statements is not

9    evidence. It is simply an outline of what the lawyer thinks the evidence will be and is offered

10   to help you understand and follow the evidence during the trial."  (Id. at 63.)

11   In its instructions at the close of the case, the court again explained that what the

12   lawyers say in their opening statements and closing arguments is not evidence. (RT 9/4/90

13   at 3.)  The court then provided a set of factors for the jury to use in determining a witness'

14   credibility.  (Id. at 4.)

15   The Supreme Court has announced a set of principles which, when applied to the

16   prosecutor's opening statement, militate against a finding that his remarks violated

17   Petitioner's fair-trial rights.  First, the jury is presumed to follow a court's curative

18   instructions.  See Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987); cf. Boyde, 494 U.S. at 384-

19   85 ("prosecutorial misrepresentations . . . are not to be judged as having the same force as an

20   instruction from the court").  The Supreme Court has also directed that "a court should not

21   lightly infer that a prosecutor intends an ambiguous remark to have its most damaging

22   meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the

23   plethora of less damaging interpretations."  DeChristoforo, 416 U.S. at 647; see Houston v.

24   Roe, 177 F.3d 901, 909 (9th Cir. 1999).  This Court presumes, therefore, that the jury

25   followed the trial court's instructions, imparted both at the beginning of the case and prior to

26   counsels' closing arguments, that the statements made by the lawyers do not constitute

27   evidence and that the jury alone is responsible for determining the credibility of the witnesses.

28

1    In addition to the court's instructions on witness credibility and the nature of opening

2    statements, other aspects of the trial lessen the degree of prejudice the prosecutor's comments

3    might have created.  For example, defense counsel's performance reduced the impact of the

4    prosecutor's remarks about Jones's testimony.  Counsel vigorously and effectively cross-

5    examined Jones (RT 8/29/90 at 50-63), and in her closing argument again attacked his

6    credibility (RT 9/4/90 at 35-38).  These factors ameliorate the danger that the prosecutor's

7    comments during his opening statement distracted the jury from making its own credibility

8    determination based upon Jones's testimony and the rest of the evidence introduced at trial.

9    Finally, and most significantly, a review of the trial testimony supports a finding that

10   the prosecutor's comments were neither improper nor prejudicial.  As anticipated in the

11   prosecutor's opening statement, Jones was a reluctant witness, unwilling or unable to testify

12   in conformity with the statement he had given to Detective Saldate.  This development

13   resulted in a shift in significance away from Jones's trial testimony toward that of Detective

14   Saldate, who testified regarding the version of events Jones had reported to him two days after

15   the killings.  (RT 8/29/90 at 120-25).  Taken together, the testimony of Saldate and Jones

16   acted to eliminate any potential prejudice arising from the prosecutor's suggestion that if

17   Jones told the truth his testimony would implicate Petitioner.  This is because, in contrast to

18   Petitioner's claim that "the prosecutor suggested that he had other evidence of [Petitioner's]

19   guilt that he might not necessarily share with the jury" (dkt. 51 at 5), the testimony of

20   Detective Saldate constituted the source of the information relied upon by the prosecutor to

21   support his belief that Jones, if he testified truthfully, could offer credible information

22   implicating Petitioner.  Therefore, the prosecutor's comments could not have led the jury to

23   convict Petitioner on evidence that was not presented; to the extent that the prosecutor's

24   opening statement implied that he possessed additional information that would support

25   Jones's testimony, that evidence came before the jury in the form of Saldate's testimony.

26   For the reasons set forth above, the Court concludes that the prosecutor did not violate

27   Petitioner's due process rights by vouching for Jones's credibility.  The prosecutor's

28

- 12 -

comments did not so infect the trial as to render it fundamentally unfair or interfere with the jury's ability to judge the evidence fairly.  Within the context of the entire trial, including the court's instructions, defense counsel's performance, and the testimony of the witnesses, the prosecutor's comments during his opening statement were limited in scope and impact, and Petitioner can demonstrate no prejudicial effect.

### B.    Comment regarding Hill's testimony.

*Background:*

With respect to Hill, the prosecutor offered the following remarks in his opening statement:

> Who else? Renee Hill is here. Renee Hill at one time was the girlfriend of Michael Jones. Renee Hill currently lives in the Projects. She is on welfare, and she is scared to death. She comes to Court today not voluntarily, but because Detective House managed to go out and find her over the last 24 or 36 hours and bring her to the Court. She is scared. Whether she should be or whether she shouldn't be, ladies and gentlemen, it doesn't matter, because in her own mind she is scared. She does not want to testify. She does not want to come into this courtroom under any circumstances. Ladies and gentlemen, she will be brought into this courtroom, and you will hear her testify.

(RT 8/28/90, Volume 3A at 67.)  Petitioner did not object to this statement until after Hill testified, at which point defense counsel moved for a mistrial, arguing that the combination of Hill's testimony and the prosecutor's comments concerning Hill's state of mind made it impossible for Petitioner to receive a fair trial.  (RT 8/29/90 at 10-12.)  In denying the motion, the trial court stated:

> [Hill's] demeanor obviously indicated she did not want to be there. She was a very reluctant witness. It was obvious she was under a great deal of stress and anxiety and fear, and she never indicated that fear was coming from any specific individual or defendant or anybody from his family.

(Id. at 12.)

On direct appeal, the Arizona Supreme Court agreed with the trial court's analysis. King, 180 Ariz. at 277-78, 883 P.2d at 1033-34.  The court further explained that:

> [F]ar from being a matter that the jury is not justified in considering, Hill's unwillingness to testify goes directly to her credibility. As with Jones, the prosecutor had no idea what Hill would say once she was on the stand. The prosecutor rightly anticipated that he would have to provide the jury some explanation for Hill's eventual refusal to identify defendant.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Hill testified that she called the police after seeing the surveillance pictures broadcast on television. She admitted that she identified defendant as the person in the picture. When asked whether defendant was the person depicted in the surveillance photograph, however, she repeatedly stated that the person in the picture did not look like defendant. Her fear and anxiety over testifying certainly served to bolster her earlier identifications over her trial testimony. Thus, we conclude that the state did not err either in eliciting testimony concerning Hill's reluctance to testify or in preparing the jury for the possibility that Hill was going to be a reluctant witness.

Id. (citations omitted).

*Analysis:*

Petitioner asserts that the prosecutor's comments implied that Petitioner had threatened Hill and that she was frightened to testify against him; as a result, Petitioner contends, "he was denied his rights to the presumption of innocence, due process, a fair trial and a reliable sentencing determination." (Dkt. 51 at 5-6.)  The Court disagrees.

The trial court and the Arizona Supreme Court accurately characterized the purpose and the effect of the prosecutor's comments regarding Hill's testimony.  King, 180 Ariz. at 277-78, 883 P.2d at 1033-34.  Moreover, as occurred with respect to the prosecutor's description of Jones's prospective testimony, Hill's testimony bore out and clarified the prosecutor's remarks about Hill's reluctance to testify, thereby reducing any potential prejudice resulting from the comments.

Petitioner has cited no authority that supports his claim that he is entitled to habeas relief under the AEDPA based upon the prosecutor's comments regarding Hill's testimony. The cases relied on by Petitioner involved misconduct far more egregious than that engaged in by the prosecutor in his opening statement.  In Hall v. United States, 419 F.2d 582 (5th Cir. 1969), for example, a case decided on direct appeal, the Fifth Circuit reversed a conviction based on a wide variety of "improper and prejudicial remarks" made by the prosecution in its closing arguments.  Among the "five areas" of "reversible remarks" was the prosecutor's assertion that the defendant had tampered with a witness and that the witness was so frightened of the defendant that he had experienced a "fit" and been hospitalized.  Id. at 584. Characterizing this commentary as a "bald assertion of fact not in evidence" and an "inference

- 14 -

. . . that could not be drawn from what meager facts were in evidence," the Court of Appeals explained that:

> The highly inflammatory nature of the remarks is obvious. They charged a separate, and a serious, criminal offense. They went to the integrity of the trial itself. And they were pursued and re-pursued after objection and admonition from the court. Where there are remarks such as here made the court should, as a minimum, sustain an objection and immediately and clearly instruct the jury that the argument is not supported by evidence.

Id. at 585.  The prosecutor's comments about Hill and her prospective testimony did not approach this level of impropriety or prejudice.

The other federal cases cited by Petitioner are equally unpersuasive.[4]  In United States v. Modica, 663 F.2d 1173 (2d Cir. 1981) (per curiam), and United States v. Polizzi, 801 F.2d 1543 (9th Cir. 1986), the courts *affirmed* convictions on direct appeal over the defendants' claims of prosecutorial misconduct.  In Modica, the prosecutor, during his closing argument, explicitly vouched for a witness's credibility and on several occasions characterized that witness, and other government witnesses, as "scared" to testify against the defendant.  663 F.2d at 1179.  The prosecutor also referred to a "mysterious third person" who had been seen with the defendant as the source of the witnesses's fear.  Id.  The Second Circuit found that, while the prosecutor's remarks during closing argument were improper, the defendant was not deprived of a fair trial.  Id. at 1182.  In Polizzi, the prosecutor suggested during his closing argument that a relative of the defendant posed a threat to the witness.  801 F.2d at 1557-58. The trial court sustained the defendant's objection and instructed the jury to disregard the comment.  Id. at 1558.  The Ninth Circuit found that the comment was improper because there was no evidence that the relative had ever threatened any witnesses.  Id.  The court held,

---

[4]      In support of Claim 3, Petitioner also cites a number of state court cases, including Arthur v. State, 575 So.2d 1165 (Ala. Cr. App. 1990); People v. Weiss, 50 Cal.2d 535, 327 P.2d 527 (1958); Morgan v. Commonwealth, 283 Ky. 588, 142 S.W.2d 123 (1940); and Duke v. State, 106 Fla. 205, 142 So. 886 (1932).  These cases, which address the improper admission of evidence, do not constitute, or even contain references to, the clearly established federal law governing Petitioner's prosecutorial misconduct claim at the time his conviction became final.

however, that the prosecutor's misconduct, which included a number of other inappropriate remarks, was harmless.  Id. at 1558-59.

By contrast with these cases, the prosecutor's remarks did not distort the evidence but accurately anticipated and addressed Hill's reluctance to testify.  The comments did not identify Petitioner, or a threat from any individual, as the source of Hill's fear.  Therefore, they did not so infect the trial as to render it unfair or interfere with the jury's ability to judge the evidence.

### C.    Conclusion.

A review of the clearly established federal law discussed above demonstrates that Petitioner has failed to show that the prosecutor's opening statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." DeChristoforo, 416 U.S. at 43.  The contested statements constituted isolated events occurring at the beginning of the trial, and as the trial progressed the concerns implicated by the comments – specifically, the credibility of witnesses – were addressed in the court's instructions, challenged by defense counsel, and placed into proper context by the nature of the testimony itself.  The prosecutor's opening statement "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." Darden, 477 U.S. at 182.  Moreover, the evidence of Petitioner's guilt was substantial; it included not only the testimony of Jones and Hill but the first-hand observations of several other witnesses and videotaped images of the shooting inside the store.

Finally, the prosecutor's statements were significantly more circumspect, and therefore less likely to cause prejudice, than other statements that have been held by the United States Supreme Court not to violate due process, including those made by the prosecutor in Darden, whose closing argument "deserve[d] the condemnation it has received from every court to review it" but nonetheless did not deprive the defendant of a fair trial.[5]  477 U.S. at 181-82.

---

[5]    In Darden, the prosecutor called the defendant an "animal," stated "I wish I could see [the defendant] sitting here with no face, blown away by a shotgun," and told the

1   Compare <u>Young</u>, 470 U.S. at 1047 (prosecutor's remarks vouching for the defendant's guilt

2   and urging the jury to "do its job" were erroneous but did not require reversal of the

3   conviction); <u>DeChristoforo</u>, 416 U.S. at 645 (prosecutor's remark, in reference to defendant

4   and his counsel, "I quite frankly think that they hope that you find him guilty of something

5   a little less than first-degree murder," was ambiguous and, in view of a curative instruction,

6   did not deny the defendant due process); and <u>Lawn</u>, 355 U.S. at 359 n.15 (comment during

7   closing argument that "we vouch for [the witnesses] because we think they are telling the

8   truth" did not deprive the defendant of a fair trial), <u>with</u> <u>Berger</u>, 295 U.S. at 85-89

9   (prosecutor's closing argument was "undignified and intemperate, containing improper

10   insinuations and assertions calculated to mislead the jury" and prejudiced the defendant where

11   the case against him was weak).

12        The decision of the Arizona Supreme Court rejecting Petitioner's challenge to the

13   prosecutor's opening statement was neither contrary to, nor an unreasonable application of,

14   clearly established federal law.  Petitioner is not entitled to relief on Claim 3.

15   **Claim 5:**      **Confrontation Clause violation.**

16        Petitioner alleges that the trial court violated his Sixth Amendment rights by admitting

17   the testimony of Detective Saldate to impeach Jones without allowing Petitioner to confront

18   Detective Saldate or Jones. (Dkt. 51 at 9-12.)

19        At issue is a statement Jones made to Phoenix Police Department Detective Armando

20   Saldate two days after the murders.  Saldate interviewed Jones at around 1:45 a.m. on

21   December 29, 1989. (RT 8/29/90 at 115.) During the interview, Jones told Detective Saldate

22   that Petitioner had killed the clerk and the security guard.  (<u>Id.</u> at 120.)  Jones explained that

23   he and Petitioner had gone to the Short Stop together, that Petitioner had entered the store

24   alone, that Jones heard shots coming from inside the shop, and that Petitioner then exited the

25   store holding a chrome pistol.  (<u>Id.</u> at 122-23.)

26

27   jury that imposing the death penalty was the only way to protect society from future crimes.
    <u>Id.</u> at 180.

28

1    Before Jones testified, defense counsel requested a ruling on the admissibility of

2    Jones's statements to Detective Saldate.  (Id. at 8-10.)  The trial court delayed its final ruling

3    until it heard the testimony of Jones and Saldate, at which point it concluded that Jones was

4    feigning memory loss regarding his statement to Saldate and ruled that the statement was

5    admissible both as a recorded recollection under Arizona Rule of Evidence 803(5) *and* as a

6    prior inconsistent statement under Rule 801(d)(1).  (Id. at 118-19.)

7    Petitioner contends that the trial court violated his Confrontation Clause rights by

8    admitting the statement as a recorded recollection without allowing Petitioner to confront

9    Detective Saldate on the question of whether Jones had adopted the statement as truthful as

10   required by Rule 803(5). (Dkt. 51 at 10; see Dkt. 26 at 2.)  This assertion ignores the fact that

11   the trial court ruled that the testimony was admissible on alternative grounds under Rule

12   801(d)(1).  Moreover, as a challenge to the state court's evidentiary ruling, the argument does

13   not present a cognizable federal claim.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

14   To the extent that Petitioner does allege a violation of the federal constitution, it is

15   alluded to in his argument that "he could not put Jones on the stand and confront him, because

16   Jones's testimony was that he did not remember what was said . . . ."  (Dkt. 51 at 12.)  The

17   Arizona Supreme Court rejected this claim, holding that admission of the statement did not

18   violate Petitioner's Confrontation Clause rights.  King, 180 Ariz. at 276, 883 P.2d at 1032.

19   The court explained:

20       In this case, the hearsay declarant, Jones, testified at trial and was
         subjected to unrestricted cross-examination. And, the fact that Jones testified
21       that he could no longer remember certain details of the crime, even assuming
         his claim were true, does not result in a violation of the confrontation clause.
22       Defendant's opportunity to cross-examine Jones before a jury satisfies the
         requirements of the confrontation clause.

23   Id. (citing United States v. Owens, 484 U.S. 554, 559 (1988)).

24       In making its decision and citing Owens, the Arizona Supreme Court correctly

25   identified and applied the relevant federal law; therefore, the "contrary to" clause of §

26   2254(d)(1) is not applicable.  See Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000)

27   (citing Williams, 529 U.S. at 404).  Instead, this Court must determine whether the Arizona

28

- 18 -

Supreme Court's application of <u>Owens</u> to the facts of this case was "objectively unreasonable." <u>See</u> <u>Visciotti</u>, 537 U.S. at 25.

In <u>Owens</u>, the Supreme Court held that an assault victim's out-of-court identification of the defendant was admissible even though the victim suffered from memory loss and testified on cross-examination that he could no longer remember seeing his assailant. 484 U.S. at 564. The Court explained:

> The Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination) the very fact that he has a bad memory.

<u>Id.</u> at 559 (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985)) (additional quotations and citations omitted). The Confrontation Clause was not violated, the Court held, because the declarant took the stand and was "subject to unrestricted cross-examination." <u>Id.</u> at 560.

The Ninth Circuit has applied the AEDPA's deferential standard of review and the holding in <u>Owens</u> to a factual situation similar to that presented by Petitioner's claim. In <u>Felix v. Mayle</u>, 379 F.3d 612, 617-18 (9th Cir. 2004), <u>reversed in part on other grounds</u>, <u>Mayle v. Felix</u>, 125 S.Ct. 2562 (2005), the Court of Appeals denied the petitioner's claim that his Confrontation Clause rights were violated by the introduction of a videotaped interview given by a key prosecution witness. The trial court had admitted the tape despite the fact that the witness claimed he could no longer remember the interview – albeit under "circumstances [that] indicated strongly that the witness' loss of memory was feigned." <u>Id.</u> at 617. The Ninth Circuit found that the petitioner failed to show that the state court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law under § 2254(d)(1). The court noted:

> The Supreme Court has held that the Confrontation Clause of the Sixth Amendment is not violated by the admission of a prior identification by a witness who is unable, because of memory loss, to testify concerning the basis for the identification. Although <u>Owens</u> did not address the question of a witness who *feigned* memory loss, no other Supreme Court decision has addressed that point either. The state court's decision that the admission of a videotaped statement of a witness who is unable, because of *feigned* memory loss, to testify

concerning the basis for the statement is not contrary to nor an unreasonable application of <u>Owens</u>, nor of any other Supreme Court case.

<u>Id.</u> at 617-18 (citation omitted).  The court further observed, again citing <u>Owens</u>, that the petitioner was free to cross-examine the witness and challenge his credibility.  <u>Id.</u> at 618.

Like the hearsay declarants in <u>Owens</u> and <u>Felix</u>, Jones took the stand at Petitioner's trial. After testifying on direct examination that his recollection of his interview with Saldate was limited, he was "subjected to unrestricted cross-examination." <u>King</u>, 180 Ariz. at 276, 883 P.2d at 1032.  The Arizona Supreme Court held that this process did not violate Petitioner's Confrontation Clause rights under <u>Owens</u>.  <u>Id.</u>  Because the decision of the Arizona Supreme Court did not involve an unreasonable application of clearly established federal law, Petitioner is not entitled to relief on Claim 5.

**Claim 8:      Multiple-homicides aggravating factor violates double jeopardy.**

Petitioner challenges the constitutionality of the trial court's determination regarding the presence of the aggravating circumstance set forth in § 13-703(F)(8).  (Dkt. 51 at 12-13.) Section (F)(8) provides that the court shall consider as an aggravating circumstance the fact that "[t]he defendant has been convicted of one or more other homicides, as defined in § 13-1101, which were committed during the commission of the offense."  The trial court found that factor (F)(8) had been proven and that it was "an aggravating factor that supports the imposition of the death penalty on either count one or count two."  (ROA 165d.)  In summarizing its findings, the court noted that "the State has proven beyond a reasonable doubt the presence of the aggravating circumstances specified by A.R.S. section 13-703(F)(5), (F)(6) and (F)(8)."  (ROA 165h.)

On direct appeal, the Arizona Supreme Court summarily rejected Petitioner's claim that application of the (F)(8) factor constituted a double jeopardy violation.  <u>King</u>, 180 Ariz. at 273, 287, 883 P.2d at 1029, 1043 (citing <u>State v. Greenway</u>, 170 Ariz. 155, 167-68, 823 P.2d 22, 34-35 (1991), and <u>State v. Ramirez</u>, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994)).

In his merits brief, Petitioner appears to make two arguments.  First, he contends that his constitutional rights were violated because the court "failed to specify to which count the

- 20 -

multiple homicide factor applied," and that this "ambiguous judgment . . . constitutes a freakish and arbitrary imposition of the death penalty." (Dkt. 51 at 13.) The Court rejects this argument because it is clear that the trial court found that the (F)(8) factor existed with respect to each conviction and applied the factor to both sentences. (See ROA 165g-165i.)

Petitioner also asserts that applying the factor to each of the murder convictions constitutes double jeopardy. (Id.) The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Supreme Court has observed that the Clause consists of several protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." United States v. DiFrancesco, 449 U.S. 117, 129 (1980) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). None of these protections are implicated by the application of the (F)(8) aggravating factor to each of Petitioner's murder convictions.

As the Supreme Court explained in Poland v. Arizona, 476 U.S. 147, 156 (1986), "Aggravating circumstances are not separate penalties or offenses . . . ." Petitioner is not being punished twice for the same crime. His sentences were based on the murders of two different victims. There are two convictions and two sentences. Aggravating circumstances, such as that set forth in (F)(8), only determine whether the crime of murder will carry the death penalty. See Lowenfield v. Phelps, 484 U.S. 231 (1988) (explaining that statutory aggravating circumstances are not offenses for double-jeopardy purposes, but rather are "procedural standards designed to control a jury's discretion in capital cases in order to ensure against capricious and arbitrary enforcement of the death penalty"). There is no Supreme Court precedent rejecting the use of multiple homicides as an aggravating factor, on double-jeopardy or any other grounds.[6]

---

[6]    To support his double-jeopardy claim, Petitioner cites Arizona v. Rumsey, 467 U.S. 203 (1984); "Grady" (presumably Grady v. Corbin, 495 U.S. 508 (1990)); and Furman

The Arizona Supreme Court's ruling denying Petitioner's challenge to the (F)(8) aggravating factor was neither contrary to, nor an unreasonable application of, clearly established federal law.  Therefore, Petitioner is not entitled to relief on Claim 8.

**Claim 11:      Unconstitutionality of the Arizona death penalty statute.**

Petitioner claims that the Arizona death penalty statute violates the Eighth Amendment because it fails to channel the sentencer's discretion.  (Dkt. 51 at 13-15.)  The Arizona Supreme Court summarily denied this claim on direct appeal.  King, 180 Ariz. at 274, 883 P.2d at 1030.

In Furman v. Georgia, 408 U.S. 238 (1972), the United States Supreme Court held the death penalty statutes of Georgia and Texas to be unconstitutional because they allowed arbitrary and unguided imposition of capital punishment.  Furman caused many states to enact new capital statutes.  A number of these statutes survived the Court's further scrutiny in Gregg v. Georgia, 428 U.S. 153 (1976).  Observing that the death penalty is "unique in its severity and irrevocability," id. at 187, the Gregg Court concluded that a death sentence may not be imposed unless the sentencing authority focuses its attention "on the particularized nature of the crime and the particularized characteristics of the individual defendant."  Id. at 206.  In imposing the death sentence, the sentencer must find the presence of at least one aggravating factor and then weigh that factor against the evidence of mitigating factors.  Id.  The Court refined these general requirements in Zant v. Stephens, 462 U.S. 862, 877 (1983), holding that a constitutionally valid capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  A death penalty scheme must provide an "objective, evenhanded and substantively rational way" for determining whether a defendant is eligible for the death penalty.  Zant, 462 U.S. at 879.

In addition to the requirements for determining eligibility for the death penalty, the

_____

v. Georgia, 408 U.S. 238 (1972).  These cases do not address the constitutional validity of the multiple-homicides aggravating factor and offer no support for Petitioner's claim.

Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence."  Tuilaepa v. California, 512 U.S. 967, 972 (1994).  "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  Zant, 462 U.S. at 879.  Accordingly, a statute that "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and Due Process concerns, id., so long as a state ensures "that the process is neutral and principled so as to guard against bias or caprice."  Tuilaepa, 512 U.S. at 973.

Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencing authority's] discretion."  Lowenfield, 484 U.S. at 244.  Each defined circumstance must meet two requirements.  First, "the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder."  Tuilaepa, 512 U.S. at 972; see Arave v. Creech, 507 U.S. 463, 474 (1993).  Second, "the aggravating circumstance may not be unconstitutionally vague."  Tuilaepa, 512 U.S. at 972; see Arave, 507 U.S. at 473; Godfrey v. Georgia, 446 U.S. 420, 428 (1980).

Arizona's death penalty scheme allows only certain, statutorily defined, aggravating circumstances to be considered in determining eligibility for the death penalty.  A.R.S. § 13-703(F).  "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]."  Blystone v. Pennsylvania, 494 U.S. 299, 306-07 (1990).  Not only does Arizona's sentencing scheme generally narrow the class of death-eligible persons, §§ 13-703(F)(5), (6), and (8) do so specifically.   In Petitioner's case, the sentencing court found that these aggravating circumstances had been proven.  (ROA 165c-165d, 165h.)  The Arizona Supreme Court independently reviewed these findings; it rejected the (F)(6) factor, reweighed the remaining

- 23 -

aggravating and mitigating circumstances, and affirmed the death sentences. <u>King</u>, 180 Ariz. at 289, 883 P.2d at 1045.

Petitioner's claim is meritless.  Rulings of the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against challenges that particular aggravating factors, including (F)(5) and (F)(6), do not adequately narrow the sentencer's discretion.  <u>See</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 774-77 (1990); <u>Walton v. Arizona</u>, 497 U.S. 639, 649-56 (1990), <u>overruled on other grounds by</u> <u>Ring v. Arizona</u>, 536 U.S. 584 (2002); <u>Woratzeck v. Stewart</u>, 97 F.3d 329, 335 (9th Cir. 1996).  The Ninth Circuit has also explicitly rejected the argument that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." <u>Smith v. Stewart</u>, 140 F.3d 1263, 1272 (9th Cir. 1998).

Petitioner's merits brief also alludes to a lack of "meaningful proportionality review" in Arizona death penalty cases. (Dkt. 51 at 15.)  There is no federal right to proportionality review where such review is not provided for by state law.  <u>Pulley v. Harris</u>, 465 U.S. 37, 43-45 (1984).  In <u>State v. Salazar</u>, 173 Ariz. 399, 416-417, 844 P.2d 566, 583-584 (1992), <u>cert. denied</u>, 509 U.S. 912 (1993), the Arizona Supreme Court held that it would no longer conduct proportionality review in death penalty cases.[7]  Therefore, Petitioner had no constitutional right to proportionality review by the Arizona Supreme Court.  <u>See</u> <u>Smith</u>, 140 F.3d at 1272 (rejecting the argument that "Arizona's proportionality review (or lack thereof) is improper").

The Arizona Supreme Court's rejection of Petitioner's challenge to the narrowing features of Arizona's death penalty statute was neither contrary to, nor an unreasonable application of, clearly established federal law.  Therefore, Petitioner is not entitled to relief on Claim 11.

**Claim 13:    Ineffective assistance of trial counsel.**

In his second amended petition, Petitioner alleged ineffective assistance of counsel

---

[7]    Accordingly, the supreme court did not conduct a proportionality review in this case.  <u>King</u>, 180 Ariz. at 273, 883 P.2d at 1029.

1   ("IAC") on four separate grounds.  (Dkt. 26 at 8.)  This Court found that three of the claims

2   were exhausted and would be reviewed on the merits.  Specifically, that trial counsel:

3   (A) refused to present Petitioner's alibi or alibi witness; (B) moved to withdraw the day before

4   trial because she believed Petitioner's sister had stolen from her; and (C) failed to develop and

5   present all available mitigating evidence and failed to identify, locate, and investigate

6   potential mitigation witnesses.[8]  (Dkt. 46 at 17-18.)

7        Petitioner presented these claims in his PCR petition.  (ROA-PCR 287 at 31-35.)  The

8   court denied all of Petitioner's IAC claims for failure to state a cognizable claim.  (ROA-PCR

9   299.)  Because the PCR court did not provide a rationale for its decision, this Court performs

10  an independent review of the record to determine whether the state court decision was

11  objectively unreasonable under controlling federal law.  Delgado II, 223 F.3d at 981-82.  For

12  the reasons set forth below, the Court concludes that the PCR court's decision denying

13  Petitioner's IAC claims was not objectively unreasonable.

14       As previously discussed, when a state court has addressed the merits of a petitioner's

15  claim of federal constitutional error, a federal court may grant habeas relief only if the state

16  court's decision was "contrary to, or involved an unreasonable application of, clearly

17  established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C.

18  § 2254(d)(1); see Yarborough v. Gentry, 540 U.S. 1 (2003); Visciotti, 537 U.S. at 19.  For a

19

20       [8]        As Respondents note, Petitioner's merits brief evinces "considerable confusion

21  concerning the sub-claims under Claim 13."  (Dkt. 53 at 1.)  For example, Petitioner

22  discusses issues related to a tainted juror, failure to investigate, inadequate cross-
    examination, and cumulative ineffectiveness, which were not included in his habeas petition.

23  (Dkt. 51 at 20-22.)  The exhausted claims alleged in the petition are addressed above.
    Petitioner failed to raise the other issues, as required by Rule 2(c) of the Rules Governing

24  Habeas Cases; therefore, they are not properly before this Court.  See Felix, 125 S. Ct. at

25  2573 (citing Rule 2(c), which instructs Petitioner to "specify all grounds of relief available"
    and to "state the facts supporting each ground"); Cacoperdo v. Demosthenes, 37 F.3d 504,

26  507 (9th Cir. 1994) (indicating that the only habeas claims a district court will consider are

27  those contained in the habeas petition itself or those raised in an amended petition or
    statement of additional claims).

28

claim alleging ineffective assistance of counsel, the applicable law is set forth in <u>Strickland</u> <u>v. Washington</u>, 466 U.S. 668 (1984).

To prevail under <u>Strickland</u>, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.  The inquiry under <u>Strickland</u> is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  <u>Id.</u> at 689.  To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  <u>Id.</u>  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694.

Furthermore, under the AEDPA, the state court's decision is subject to another level of deference.  <u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002).  Therefore, in order to merit habeas relief, Petitioner must make the additional showing that the PCR court's ruling that counsel was not ineffective constituted an unreasonable application of <u>Strickland</u>.  28 U.S.C. § 2254(d)(1).

**A.**    **Trial counsel refused to present Petitioner's alibi or alibi witness.**

On January 4, 1990, Petitioner was indicted on two counts of first-degree murder and one count of armed robbery.  (ROA 3.)  On January 25, 1990, Petitioner's court-appointed counsel, Roland Steinle, III, of the Maricopa County Public Defender's Office, filed a notice listing five defenses, including the defense of alibi.  (ROA 14.)  On February 20, 1990, Mr. Steinle filed a motion to determine conflict of interest, noting that his office may have represented three potential trial witnesses in a number of other criminal matters.  (ROA 21.) On March 8, 1990, the court permitted the Public Defender's Office to withdraw and appointed Mary Wisdom, from the private bar, to represent Petitioner.  (M.E. 3/8/90.)  Ms.

1    Wisdom represented Petitioner through the guilt stage of the trial.  She did not present an alibi

2    defense, but argued that reasonable doubt existed as to whether Petitioner was the individual

3    who shot the clerk and the security guard. (See RT 9/4/90 at 27-41.)  The centerpiece of this

4    argument was Ms. Wisdom's attack on the credibility of the State's key witnesses, Jones and

5    Hill.  In Claim 13(A), Petitioner alleges that he "had an alibi defense in that his mother would

6    have testified that he was at home with her that evening," and that Ms. Wisdom's failure to

7    present such a defense "offends basic notions of minimal competence of representation."

8    (Dkt. 51 at 16.)  The Court disagrees.

9         As Respondents correctly observe, Petitioner "has not identified where in the record

10   is the information that Wisdom knew that his mother was available as an alibi witness." (Dkt.

11   53 at 23.)  In fact, the claim that Petitioner's mother could have served as an alibi witness

12   arises for the first time in Petitioner's merits brief. (Dkt. 51 at 16.)  Petitioner did not identify

13   his alibi witness in the notice of defenses filed by Mr. Steinle (ROA 14), in any of his PCR

14   filings (see ROA-PCR 287 at 17, 296 at 8, 308 at 7-8), or in his second amended petition for

15   habeas corpus, where the claim reads, in its entirety, "Mr King provided his trial counsel with

16   an alibi and alibi witnesses, but trial counsel refused to use it" (dkt. 26 at 8).  The continuing

17   absence of any details regarding the nature of Petitioner's alibi is particularly noteworthy, not

18   only because such information would be central to any court's assessment of Petitioner's IAC

19   claim under both prongs of Strickland, but because Petitioner failed to put forward any

20   specifics despite the State's response to his PCR petition, which noted, "Nothing in the record

21   of the trial or post-trial proceedings indicates that there ever was a viable alibi defense or that

22   Wisdom was ineffective for not adopting it."[9]  (ROA-PCR 292 at 10.)  Despite being put on

23   notice of this deficiency, Petitioner failed to offer any support for this aspect of his IAC claim

24   until he placed a passing reference to his mother as the alibi witness in his merits brief.

25   _____

26        [9]    The record includes letters written to the trial court by Petitioner (ROA 152)
     and Petitioner's mother (ROA 166o1) after his conviction and prior to sentencing; each
27   features protestations of Petitioner's innocence, but neither includes a claim that Petitioner
     was with his mother at the time of the murders.

28

1    Petitioner's allegations fail to establish that he is entitled to relief.  The record is simply

2    bereft of any factual support for the claim that Ms. Wisdom could have presented an alibi

3    defense, let alone that her failure to do so, and to pursue instead an argument based upon

4    reasonable doubt, constituted ineffective assistance.  Given the "facts of the particular case,"

5    <u>Strickland</u>, 466 U.S. at 690, which included substantial evidence placing Petitioner at the

6    scene of the robbery and murders, even if Petitioner had indicated the existence of an alibi

7    witness, this Court cannot conclude that it was unreasonable for Ms. Wisdom to decide not

8    to present such a defense but to focus instead on the credibility of the State's key witnesses.

9    Therefore, with respect to Ms. Wisdom's decision not to present an alibi defense, Petitioner

10   has satisfied neither the <u>Strickland</u> test, with its presumption that counsel's actions were

11   strategically sound, nor the deferential standard of § 2254(d)(1).

12   After an independent review of the record, this Court concludes that the decision of the

13   PCR court denying this claim was not objectively unreasonable.  Therefore, Petitioner is not

14   entitled to relief on Claim 13(A).

15        **B.    Counsel moved to withdraw the day before trial.**

16   Petitioner alleges that he was denied effective assistance of counsel because on the first

17   day of the trial Ms. Wisdom, citing a potential conflict of interest based upon her belief that

18   Petitioner's sister had stolen money from her, moved to withdraw as counsel.  (Dkt. 26 at 8.)

19   According to Petitioner, this placed him "in the untenable position of waiving the conflict or

20   asking for a continuance to permit a new lawyer to come in and take over the case."[10]  (<u>Id.</u>)

21   Prior to jury selection, Ms. Wisdom raised concerns with the court about a potential

22   conflict of interest arising from her belief that Petitioner's sister had stolen money from her

23   purse during a witness interview.  (RT 8/27/90 at 2-8.)  Ms. Wisdom explained to the court,

24   _____

25        [10]     In his second amended petition, Petitioner stated this claim as one of
     ineffectiveness of counsel (dkt. 26 at 8), which is how the claim was exhausted in state court.
26   To the extent that Petitioner now attempts to raise a conflict-of-interest claim and/or a claim
     based upon the validity of his waiver of such conflict, the claims are not exhausted and are
27   not properly before this Court.

28

however, that she did not think that the incident "affected my ability to represent Mr. King." (Id. at 5; see ROA-PCR 287, App. F at 2.)  Nevertheless, in response to the incident the court appointed an attorney who independently consulted with Petitioner (id. at 2-3), after which Petitioner waived any conflict and indicated that, "I want Miss Wisdom to represent me, yes" (id. at 7).

The Court has thoroughly reviewed Petitioner's merits brief in an attempt to ascertain the basis of his claim that the scenario described above constituted IAC.  The only argument Petitioner offers, which is raised for the first time in the merits brief, is the contention that, "It constitutes ineffective assistance of counsel for counsel to separate himself from his client, conveying to the jury that he reluctantly represents his client." (Dkt. 51 at 16.) This argument is without merit; there is no evidence that Ms. Wisdom conveyed to the jury any reluctance to represent Petitioner.[11]

With respect to Ms. Wisdom's request to withdraw from representing Petitioner prior to trial, Petitioner has satisfied neither the <u>Strickland</u> test nor the deferential standard of § 2254(d)(1).  Having completed an independent review of the record, the Court finds that the decision of the PCR court denying this claim was not objectively unreasonable.  Petitioner is not entitled to relief on Claim 13(B).

**C.    Counsel failed to develop and present mitigation evidence.**

Petitioner contends that Ms. Wisdom and Mr. Steinle failed to prepare an adequate mitigation case and failed to identify, locate, and investigate potential mitigation witnesses. Specifically, according to Petitioner, counsel did not perform an "in-depth investigation into all aspects of [Petitioner's] life to develop a social and medical history for him." (Dkt. 51 at 19.)

*Background:*

---

[11]    The case relied upon by Petitioner, <u>King v. Strickland</u>, 714 F.2d 1481 (11th Cir. 1983), involving comments defense counsel made about his client during his closing argument before the jury, is readily distinguishable.

On October 3, 1990, Ms. Wisdom moved for funding for a mental health examination of Petitioner (ROA 145); the trial court granted the motion (ROA 146).  Ms. Wisdom also moved for an order requiring disclosure of the psychiatric records of Petitioner's father from the Arizona State Hospital (ROA 147a-147b); again, the court granted the motion (ROA 147c).  Earlier in the case, Ms. Wisdom had moved for orders disclosing Petitioner's school records (ROA 43) and prison file (ROA 45).  According to Ms. Wisdom, in "preparation for mitigation," she also interviewed "several family members."  (ROA-PCR 287, App. F at 2.)

On October 22, 1990, after Petitioner had been convicted but prior to sentencing, Ms. Wisdom filed a motion to determine counsel.  (ROA 149.)  The motion was prompted by Petitioner's accusation that Ms. Wisdom had conspired with the prosecution to convict him because of his race.  (Id.)  At a hearing on Ms. Wisdom's motion, Petitioner indicated unambiguously that he was dissatisfied with Ms. Wisdom's performance and that he wanted new counsel.  (See RT 10/30/90 at 3.)  Petitioner also confirmed the sentiment expressed in his letter to the court (ROA 152), that Ms. Wisdom's racial prejudice was part of the conspiracy that resulted in his conviction.  (RT 10/30/90 at 7.)  Given Petitioner's attitude, Ms. Wisdom expressed concern that she would be unable to represent Petitioner effectively during sentencing because Petitioner "will not cooperate with me in what evidence we ought to present to the court in mitigation."  (Id. at 6.)  She also indicated that the potential conflict of interest that caused Mr. Steinle to withdraw no longer existed because none of the witnesses his office represented were called at trial.  (Id. at 2.)  The court permitted Ms. Wisdom to withdraw, citing "the deterioration of the attorney/client relationship . . . and the fact that Miss [sic] Wisdom will no longer be able to effectively represent Mr. King," and re-appointed the Public Defender's Office.  (RT 10/30/90 at 8.)

The court held a status conference on November 7, 1990, at which Mr. Steinle was appointed to replace Ms. Wisdom.  (RT 11/7/90.)  Mr. Steinle expressed his concern about resuming representation after another attorney had represented Petitioner during the guilt stage of the trial; he requested and was granted a continuance of the sentencing hearing. (RT

11/7/90 at 24.) Petitioner indicated that he wanted Mr. Steinle to represent him, and waived any conflict of interest with the Public Defender's Office. (Id. at 12-13, 15-16, 21.) At another status conference, on January 4, 1991, Mr. Steinle indicated that a date of February 12, 1991, would be appropriate for the sentencing hearing; the court scheduled the hearing for February 15. (RT 1/4/91 at 2-3.)

The sentencing hearing took place on March 1, 1991, approximately four months after Mr. Steinle was reappointed. (RT 3/1/91.) The State called one witness, a fingerprint expert who matched Petitioner's thumb print with the print contained in the records from Petitioner's prior conviction for kidnapping and sexual assault. (Id. at 8-10.) Mr. Steinle presented the testimony of Mickey McMahon, the psychologist retained by defense counsel. (Id. at 12-49.)

Dr. McMahon had examined Petitioner and prepared a report. (ROA-PCR 292, Attachment 3.) He performed a clinical interview of Petitioner and conducted a variety of psychological tests, including the MMPI, the Rorschach inkblot test, and the Williams Sentence Completion Test. (Id. at 4.) Dr. McMahon interviewed family members, including Petitioner's mother and brother, and "provided their family history." (RT 3/1/91 at 58.) Dr. McMahon included this information in his report and discussed it in his testimony. (ROA-PCR 292, Attachment 3 at 1-3; see RT 3/1/91 at 19-24.) He also reviewed a number of records, including the presentence investigations for this case and for Petitioner's prior conviction; the Arizona State Hospital records of Petitioner's father; and a "computerized psychological report" from the Arizona Department of Corrections.[12] (ROA-PCR 292, Attachment 3.)

At the presentencing hearing, Dr. McMahon testified that Petitioner had experienced

---

[12] According to the presentence investigation, this psychological report, dating from 1983, "did not identify any specific problem areas for counselor intervention at this time." (ROA 166f at 6.) The report "indicate[d] no severe depression or signs of gross psychotic pathology." (Id.) The data described only a "'neurotic debility,' with a low level chronic prognosis." (Id.) The report also indicated that Petitioner possessed an IQ of 99, placing him in the average range. (Id.)

events in his childhood, including his parents' divorce, the death of his father, and incidents

of domestic violence involving his mother and her live-in boyfriend, that caused him to suffer

from post-traumatic stress disorder. (See RT 1/4/91 at 15-29.) Dr. McMahon's evaluation

of Petitioner also included diagnoses of anti-social personality and mixed substance abuse.

(ROA-PCR 292, Attachment 3 at 6.)

In support of his sentencing arguments, Mr. Steinle filed a 21-page memorandum,

which focused on mitigating circumstances, including Petitioner's troubled family history and

Dr. McMahon's diagnosis of Petitioner's psychological condition. (ROA 163.) Mr. Steinle

also filed a 16-page response to the State's sentencing memorandum raising constitutional

challenges to Arizona's death penalty statute. (ROA 164.)

In sentencing Petitioner, the trial court found that the State had proven three

aggravating factors. (ROA 165c-165d, 165h.) The court also found that Petitioner had

proven a number of nonstatutory mitigating circumstances: that he had a troubled childhood

and came from a dysfunctional family; that he suffered from a substance abuse problem, post-

traumatic stress disorder, and an anti-social personality disorder; and that his family loved

him.[13] (ROA 165d-165g, 165h.) The court concluded, however, that these mitigation

circumstances, "considered individually or collectively," were not sufficient to call for

leniency. (ROA 165h.)

*Analysis:*

The right to effective assistance of counsel applies not just to the guilt phase, but "with

equal force at the penalty phase of a bifurcated capital trial." Silva v. Woodford, 279 F.3d

825, 836 (9th Cir. 2002) (quoting Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir. 1995)).

Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary"; however, "a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances, applying a

---

[13]    The court rejected counsel's argument that remorse and the risk of future criminal conduct constituted nonstatutory mitigation factors. (ROA 165f-165g.)

heavy measure of deference to counsel's judgments." Hayes v. Woodford, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 691). With respect to the prejudice prong of a sentencing-stage IAC claim, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In Wiggins v. Smith, 539 U.S. 510, 534 (2003), the Court further noted that, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." Wiggins, 539 U.S. at 536 (quoting Williams, 529 U.S. at 397-98).

While Petitioner focuses his argument on the reasonableness of trial counsels' performance, it is unnecessary for this Court to undertake such an analysis because Petitioner has failed to meet his burden under the second prong of Strickland, which requires that he "affirmatively prove prejudice." 466 U.S. at 693. As the Strickland Court explained, "A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"); see Smith v. Robbins, 528 U.S. 259, 286 n.4 (2000); Fields v. Brown, 431 F.3d 1186, 1203-04 (9th Cir. 2005).

In support of his argument that counsel were ineffective at sentencing, Petitioner relies exclusively on an affidavit prepared by a mitigation specialist named Mary Durand in May of 1997 and filed with Petitioner's reply to the State's response to Petitioner's motion for rehearing on his PCR petition. (ROA-PCR 302, Ex. A.) In her affidavit, Ms. Durand outlined her view of the proper scope of a comprehensive mitigation investigation and opined that "no competent or reliable investigation" was conducted on Petitioner's behalf prior to sentencing. (Id. at 6.) The Durand affidavit does not, however, contain any information suggesting what the results of a more complete social and medical history of Petitioner would have revealed.

1    The record contains no evidence suggesting that there existed additional mitigating

2   information that trial counsel failed to uncover.  The only attempt to proffer such information

3   is contained in an evaluation performed by a psychologist named Michael Bayless, whose

4   report, dated November 4, 1996, was filed in support of Petitioner's PCR petition.  (ROA-

5   PCR 287, App. B.)  Dr. Bayless undertook the evaluation "to determine whether [Petitioner]

6   has suffered from any mental disease of [sic] defect or has any historical factor that would

7   change his sentence of death to a life sentence."  (Id. at 1.)

8    With respect to mitigating circumstances, Dr. Bayless's report contains no information

9   substantially different from that included in Dr. McMahon's report and testimony.  The

10  Bayless report repeats the same details about Petitioner's traumatic childhood and its effect

11  on his mental health.  (Id. at 1-2, 4-6.)  Like Dr. McMahon, Dr. Bayless diagnosed Petitioner

12  as chemically dependent.  (Id. at 6.)  Both psychologists attributed Petitioner's criminal

13  behavior to his childhood trauma and history of substance abuse.  (Id. at 4-6; ROA-PCR 292,

14  Attachment 3 at 4-6.)  Because it contains no new information that would have supported

15  Petitioner's case in mitigation, nothing in Dr. Bayless's report suggests that if trial counsel

16  had undertaken a more extensive investigation, they would have located additional, relevant

17  mitigating evidence.[14]  Petitioner has not shown, in other words, that defense counsel failed

18  to present all of the available and relevant mitigation information at sentencing.  At most, the

19

20

---

21        [14]    Much of the information in Dr. Bayless's report suggests that further
22  investigation into Petitioner's background would not have been productive.  The report
    indicates that there was not a history of mental illness in Petitioner's family.  The report also
23  states that, despite Petitioner's claim that while on death row two years ago – i.e., in 1994,
    three years after his conviction – he was "hearing voices," Petitioner's "memory, judgment,
24  concentration, and decision making ability appear to be well within the normal range."
25  (ROA-PCR 287, App. B at 3-4.)  Moreover, according to Dr. Bayless, Petitioner does not
    "have any history . . . [or] exhibit any signs that he would be suffering from any type of
26  neurological interference."  (Id. at 4.)  Dr. Bayless also concluded that Petitioner did not
27  suffer from an antisocial personality disorder (id. at 5), which was one of the mitigating
    factors the trial court found (ROA 165g).

28

Bayless report offers support for the mitigation factors which the trial court did in fact find.[15]

The failure to identify mitigation information that could have been presented but was not is fatal to Petitioner's sentencing-phase IAC claim because, as noted above, clearly established federal law, in the form of Strickland and its progeny, requires Petitioner to show that he was prejudiced by counsels' deficient performance. A review of Ninth Circuit cases makes clear that Petitioner has not met his burden under Strickland. In Villafuerte v. Stewart, 111 F.3d 616, 631 (9th Cir. 1997), for example, the habeas petitioner claimed that trial counsel was ineffective at sentencing because his investigation into mitigating circumstances was inadequate. The Ninth Circuit rejected the petitioner's IAC claim because "he presented no evidence concerning what [counsel] would have found had he investigated further, nor what lengthier preparation would have accomplished," and therefore failed to show that he had been prejudiced. Id. at 632. The Ninth Circuit reached similar conclusions in Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (IAC claim lacked merit where petitioner failed to specify what information further investigation would uncover), and Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996) (IAC claim failed without an explanation of what compelling evidence additional investigation would have revealed).

Petitioner has presented nothing by way of evidence or fact-specific arguments that would support a finding that he was prejudiced by counsels' failure to undertake a more thorough mitigation investigation. Without any factual support for the claim that additional mitigation information existed, this Court cannot conclude that there was a reasonable probability that had counsel undertaken a more-comprehensive investigation, the trial court would not have sentenced Petitioner to death. Whether or not counsels' investigation of Petitioner's medical and social background was inadequate, thus rendering counsels' performance at sentencing deficient, Petitioner has not demonstrated prejudice under the

---

[15]    The Court notes that neither Dr. McMahon nor Dr. Bayless indicated that they lacked access to any records or background information necessary to complete their evaluations, see, e.g., Sims v. Brown, 425 F.3d 560, 583-86 (9th Cir. 2005), again suggesting that the scope of the mitigation investigation was adequate.

second prong of <u>Strickland</u>.

After an independent review of the record, this Court concludes that the decision of the PCR court denying Petitioner relief on this claim was not objectively unreasonable. Petitioner is not entitled to relief on Claim 13(C).

### EVIDENTIARY DEVELOPMENT

In its procedural default order this Court denied Petitioner's request for an evidentiary hearing, but stated that Petitioner may, in his merits brief, "renew his request that an evidentiary hearing be held on those claims." (Dkt. 46 at 19.)  Petitioner did not make such a request. Furthermore, the Court concludes that none of Petitioner's claims warrant evidentiary development because the allegations upon which they are based, even if true, do not entitle Petitioner to habeas relief.

### CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Second Amended Petition for Writ of Habeas Corpus (Dkt. 26) is **DENIED WITH PREJUDICE.**  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on July 15, 1998, is **VACATED.**

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

. . .

1   Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

2   Arizona 85007-3329.

3           DATED this 22nd day of June, 2006.

4

5

6   _____

7           Robert C. Broomfield
            Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                            - 37 -